## W. A. STAGNER v. THE STATE.

1. JURY LAW — VOIR DIRE. — The paramount object of the preliminary examination of jurors in any case, but especially in trials for capital felonies, is to secure to the accused a fair trial by an impartial jury, in conformity with a constitutional guaranty and the statutory regulations subordinate thereto.

2. BIAS — DISQUALIFYING CONCLUSIONS. — CHALLENGE FOR CAUSE is an objection to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury; as, for instance, that he has a bias or prejudice in favor of or against the defendant, or that, from hearsay or otherwise, there is established in his mind such a conclusion as to the guilt or innocence of the defendant as will influence his action in finding a verdict.

3. SAME — PRACTICE. — To test the existence of such disqualifying conclusion, it is enacted that the juror shall be first asked whether, in his opinion, the

conclusion will influence his verdict, and that, in case he answers affirmatively, "he shall be discharged." *Held*, that this statutory injunction is imperative, and that no further examination of the juror is legitimate after he has answered that the conclusion, however formed, will, in his opinion, influence his verdict.

4. SAME. — If, however, the juror answers that the conclusion will not influence his verdict, then the law provides that he shall be further examined by the court, or under its direction, as to how his conclusion was formed and the ·extent to which it will influence his verdict. *Held*, that this further examination is to satisfy the court of the juror's impartiality, and if the court is not so satisfied the juror should be discharged, whether challenged or not. No formula or general rule controls this further examination, but it should be restricted to the imputed disqualification; and the juror, unless contumacious, should not be subjected to the treatment of a refractory witness. Consult the opinion *in extenso* on this subject.

5. MURDER — CHARGE OF THE COURT. — If, in a trial for murder, there is evidence tending to show that the homicide, though culpable and without such cause as mitigates murder to manslaughter, was committed on provocation and not with the sedate mind characteristic of murder in the first degree, the charge to the jury should not ignore that aspect of the case.

6. DECLARATIONS AS RES GESTÆ. — The State was allowed, over objection, to prove the deceased's statement, twenty minutes after he was shot, respecting the cause and circumstances of the shooting. No predicate for the proof as dying declarations was laid. *Held*, in view of the concomitant evidence, that the proof was admissible.

APPEAL from the District Court of Polk. Tried below before the Hon. E. HOBBY.

The appellant was convicted of the unnatural and shocking crime of parricide. The jury, though finding the offence to be murder in the first degree, assessed the penalty at confinement in the penitentiary for life, the appellant having been but sixteen years old when he committed the deed.

C. C. Snell, for the State, testified that in October, 1878, he lived with and worked for W. A. Stagner, the father of the appellant. On the 9th or 10th of that month, while the family were at dinner, the appellant and his father had a dispute about some corn. After dinner they and the witness went out on the gallery. A little sister of the appellant was crying because she was not allowed a particular

seat at the dinner-table, and, this appearing to annoy their father, he stepped into the yard, got a small switch, and struck her with it a few times. This made the child cry worse, and then her father whipped her on the skin. Appellant had been sitting on the gallery, and got up, stepped into a room where there were two guns, and came back with one of them in his hands, saying to his father, " G—d d—n you, don't whip her any more," or words to that effect. His father replied, " Well, shoot! shoot!" and advanced a little towards the appellant, when the gun was discharged, and the load took effect in his right arm, between the wrist and elbow. The wounded man seized the gun with his left hand, and called to the witness to come there. The witness went to the appellant and his father, and took hold of the gun, telling them to let it loose; which they did. Witness put the gun away, and the wounded man requested him to go for a doctor. Witness went for a doctor, but did not succeed in bringing one; and when he returned, which was about midnight, W. A. Stagner was dead.

On his cross-examination, the witness stated that he was not positive whether or not the deceased had got hold of the gun before it was discharged. When witness started for the doctor, the deceased was walking about, and his wound bleeding freely. Witness gave him a small pill of opium, about half the size of a small buckshot, and this, besides pouring water on the wound, was all that was done for it, so far as witness knew.

John Pol, for the State, testified that he was in a field near Stagner's house, when he heard the report of a gun and loud screaming. Mr. Snell then came running and said that the appellant had shot his father, and requested witness to help him get a horse on which to go for a doctor. Witness, while looking for the horse, saw the appellant and said to him, " Willie, what have you done?" and he replied, " Mr. Pol, I could not help it; I did it through a pas-

sion.  If I had it back, I would not do it for ten thousand dollars.''  Appellant further said that when he had run away from home, before that, it would have been better for them not to have come after him and brought him back, for that he ran away then to keep from doing this very thing; that his father had once whipped his mother with a rope, and he had not forgotten it.  The witness went at once to Stagner's house, and found him in the yard holding his arm, which was bleeding.  In reply to an inquiry by witness, the deceased said, '' I was whipping Bettie, and Willie [the defendant] came out of the room with a gun, cursing me, and told me to stop.  I said, ' Shoot! shoot! shoot!' and no sooner had I said it the third time than he shot me.''  To this statement the defence objected, as being neither *res gestœ* nor a dying declaration; but the court held it to be *res gestœ* and admissible, and the defence reserved a bill of exceptions, in which it is stated that, according to the testimony, about twenty minutes had elapsed after the shooting before the statement was made by the deceased.

Dr. Angell, for the State, testified that he reached Stagner's about five o'clock on the afternoon of the day on which the shooting was done, and found W. A. Stagner in a cold perspiration, almost pulseless, and still bleeding as freely as a man could in his condition.  About half-past eight o'clock in the evening he died.  His death was caused by a gunshot wound in the arm, and by the hemorrhage and shock which resulted from the injury.  Witness, on his arrival, inquired whether the arm had been corded, and learning that it had not, he immediately corded it and stopped the effusion, and administered morphine.  It was the opinion of the witness that if proper steps had been promptly taken the wound would not have been mortal.

There was other testimony at the trial, but not of a material character, except that of the appellant's mother, who proved that he was not sixteen years of age in October, 1878.  Other matters appear in the opinion.

No brief for the appellant has reached the reporters.

*Thomas Ball*, Assistant Attorney-General, for the State.

Winkler, J. The appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the State penitentiary for the period of his natural life. The record before us presents a most extraordinary case. Some of its peculiarities will be noticed in this opinion.

It appears from the record that the appellant was under the age at which he could by law be punished capitally, being a mere boy, and it is but fair to presume that, partly at least, on this ground the death-penalty was not imposed, it appearing in the record that it was pleaded and was proved on the trial that he had not attained the age of seventeen years at the time of committing the act which resulted in the death of the deceased. It further appears that the deceased was the father of the appellant, and that the trouble began on account of the correction of a small daughter of the deceased, and sister of the appellant, by the deceased. The wound was inflicted upon one of the arms of the deceased, and in the opinion of the medical attendant who was called in after the wound had been inflicted, but before the death, it was not necessarily a mortal wound, he having testified that there was great carelessness and ignorance in not cording the arm when the wound was first inflicted. In other respects, as developed by the record, the case is one of an appalling and lamentable character.

It is shown by the record that much difficulty was encountered on the trial below in obtaining a jury for the trial, which is doubtless to be attributed in a great degree to the peculiar features of the transaction and a desire on the part of jurors to avoid the responsibility of determining the questions involved. It is found, on inspection of the numerous bills of exception taken to the rulings of the court, that no less than nineteen challenges of persons

offered as jurors were passed upon by the court, and that challenges for cause made on behalf of the defendant were overruled by the court and the defendant driven to peremptory challenges before he had exhausted the number of peremptory challenges allowed him by law; and to all these rulings bills of exception were reserved. It is further shown by bills of exception that four of the jurors who sat upon the trial went into the jury-box after he had exhausted his peremptory challenges, and after the court had overruled challenges for cause interposed by the defendant's counsel, after a protracted examination on *voir dire* as to their ability to give the defendant a fair trial notwithstanding their previous opinions as to his guilt or innocence. · Another bill of exceptions, which embraces twenty-eight persons, of whom nine sat upon the trial, states substantially as follows : On the examination before the court touching their qualifications as jurors in the case, the proposed jurors were each asked the question, "Could they go into the jury-box believing the defendant to be innocent until his guilt was established by evidence?" to which the counsel for the State objected, for the reason that the law only required the jurors to go into the jury-box presuming that the defendant was innocent until his guilt was established, and did not require a jury to positively believe either; if so, the juror would not be an impartial juror. The court sustained the objection, and the defendant excepted.

As to jurors who sat upon the jury, and who were offered subsequently to the exhaustion by the defendant of his peremptory challenges, the mode and extent of the examination as to their partiality or impartiality will be more fully understood by stating somewhat at length the contents of bills of exception ; and in this connection we will first present the examination of the juror Ben Glass, who appears to have been the first of the four jurors who sat upon the trial after having been challenged for cause and the cause of challenge held insufficient by the court, and afterwards we will present that of the juror McCoghren, the last of the four.

When the juror Glass was being examined, he stated that he had formed an opinion as to the guilt or innocence of the defendant, and that the opinion was formed from hearsay; and upon being examined by the defendant, he stated that it would require evidence on the part of the defendant to change his opinion; and in answer to the question, "Would we have to introduce evidence to change that opinion?" he answered, "Yes," and said that the opinion could be changed by evidence, and unless he heard some evidence in the case he would entertain his same opinion: that he believed the report he had heard. On being examined by the court, he said that as a sworn juror he could try the defendant according to the law and evidence; that, as a sworn juror, he had no opinion that would have the slightest weight with him as a juror; that he could give the defendant a fair and impartial trial as a sworn juror, and as such give him the presumption of innocence. And, being reëxamined by the defendant, he said that it would require evidence to remove the opinion that he had, and unless he should hear something else he would be of the same opinion still. The juror was held qualified by the court, the challenge for cause was overruled, and the juror was sworn. To this bill of exceptions is found appended the following: "In signing the above, it should be shown that the juror, in explanation and in qualification of his answers, said this was the frame of his mind: that he had no opinion that would have the slightest influence on his verdict; that he would require the same amount of evidence to convict as if he had never heard of the case; that he would presume the defendant innocent until the State proved his guilt beyond any reasonable doubt, and that was the way he would go into the jury-box."

As to the juror McCoghren, the bill of exceptions shows this state of case: This juror on his examination stated that he had formed an opinion in the case as to the guilt or innocence of the defendant, and that the opinion was formed from hearsay; that as a sworn juror he could go into the

jury-box and lay that opinion aside, and render a verdict according to the law and evidence ; that as a sworn juror he would not allow the opinion to have any influence with the verdict he rendered in the case. On being examined by the defendant's attorney, he said that he believed the rumors about the case he heard, and had no reason to disbelieve them ; that the defendant would have to introduce some evidence to remove the opinion from his mind, and the contrary to the rumors would have to be shown before he would change the opinion he then had ; that the opinion was not so fixed in his mind but that evidence could remove it. In answer to the question by defendant, " Would we, in behalf of the defendant, have to introduce any evidence to change your opinion ? " he answered that he thought they would ; and in answer to the question, " Would we have to do anything in this case to change your opinion ? " he answered, " Yes." The defendant challenged for cause. The court then examined the juror, who said that he would not allow the opinion he had to influence his action as a sworn juror ; that he could try the defendant as a sworn juror as though he had never heard of the case ; that, after being sworn in the case, he, as a juror, could go into the jury-box and give the defendant the presumption of innocence under the law, and under oath give him a fair and impartial trial. The court held the juror competent, when the defendant, by permission of the court, was allowed to again examine the juror, when he said it would require evidence on the part of the defendant to change the opinion he then had, and unless he heard something else in the case he would still entertain the same opinion he then had. The defendant again challenged for cause, which was overruled, and the juror was sworn.

To this bill of exceptions is appended the following, over the signature of the judge : "After being examined by the State and the defendant, the juror stated (as each and every juror did who was examined on his *voir dire*) to the court, in explanation and qualifica-

tion of all his answers, that the condition of his mind was this : that he had no fixed opinion whatever about the case — no opinion that would influence in any degree his verdict ; that he would go into the jury-box giving defendant the same presumption of innocence the law did ; that he would require as much evidence from the State to convict as though he had never heard of the case, and before he would render a verdict of guilty the State must prove beyond any reasonable doubt the defendant's guilt ; and that was the meaning of his answers to all former questions asked him.''

One other bill of exceptions discloses the following with reference to the jury, and embraces quite a number of jurors and three-fourths of those who sat upon the trial : The defendant asked the jurors (some eighteen in number), on their *voir dire*, after the fact was disclosed that they had formed an opinion in the case, if they did not believe and were of opinion that the defendant was guilty ; did they believe from what they had heard that the defendant was innocent? To which the State's counsel objected, and the court held that the jurors on their *voir dire* could not be asked whether they believed the defendant guilty or whether he was innocent ; that the jurors could not be required to state that they believed positively anything they believed about the guilt or innocence ; and the court sustained the objections. The defendant excepted to the ruling of the court.

It will be conceded by all that the paramount object to be attained in the examination of jurors summoned in any case, but especially in a capital felony, is that the accused may have a fair and impartial trial under the Constitution and laws. The Bill of Rights guarantees that in all criminal prosecutions the accused shall have a speedy public trial by an impartial jury ; and everything in the Bill of Rights is placed beyond legislative control. Const., Art. I., sects. 10, 29. It would be out of the power of the Legislature, even if it were so disposed, to deprive one protected by this

constitutional guaranty of a trial by an impartial jury. This right, among others, is excepted out of the general powers of the government, and courts, legislators, and all citizens, whether public or private, are commanded to observe and obey its behests. The Legislature may regulate, however, and has regulated, the qualification of jurors, and may and has prescribed the manner of enforcing their attendance, and the like. The Legislature has prescribed the manner of testing the qualifications of jurors, which must obtain and govern when and to the extent that they apply, subordinate always to the constitutional requirements.

With reference to cases like the present, the Code of Criminal Procedure directs that the names of those summoned as jurors shall be called at the court-house door, and such as are present shall be seated in the jury-box, and when those who are present are seated in the jury-box the court shall cause to be administered to them an oath, which is set out at length in the Code, touching their service and qualification as jurors. Arts. 618, 619. Subsequent articles prescribe rules as to other matters, and among them the challenge to the array, if any there be. In testing the qualifications of jurors generally, and after they shall have been sworn as required by art. 619, two questions are to be propounded to each juror by the court, or under its direction, to wit: 1. Are you a qualified voter in this county and State, under the Constitution and laws of this State? 2. Are you a householder in the county or a freeholder in the State? If the person interrogated answers the foregoing questions in the affirmative, the court shall hold him to be a qualified juror, until the contrary be shown by further examination or proof. Art. 631.

Most of the questions presented in the record before us relate to what are denominated challenges for cause. A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. Art. 636. In this article are enumer-

ated several causes of challenge, and among them the following: "12. That he has a bias or prejudice in favor of or against the defendant. 13. That from hearsay, or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as will influence him in his action in finding a verdict." And it is further provided in this article of the Code that, for the purpose of ascertaining whether this thirteenth cause of challenge exists, the juror shall be first asked whether, in his opinion, the conclusion so established will influence his verdict. "If he answer in the affirmative, he shall be discharged; if he answer in the negative, he shall be further examined by the court, or under its direction, as to how his conclusion was formed, and the extent to which it will affect his action, and if the court is not satisfied that he is impartial the juror shall be discharged." Art. 636. It is further provided, in art. 637, that upon a challenge for cause the examination is not confined to the answers of the jurors, but other evidence may be heard in support of or against the challenge.

From these articles of the Code of Procedure we think it perfectly plain that, whilst no rule can be laid down by which the examination shall be made, or what questions may be asked of the juror in order to determine his capacity and fitness to serve on the jury, the examination is confided to and under the direction of the court, and should be confined, in some degree at least, to the questions raised by the particular cause of challenge under investigation at the time. The object of these examinations and their extent should be confined to the one end of testing the juror's capabilities and fitness to serve as a juror impartially as between the State and the defendant, and whether or not he can render an impartial verdict under the law and from the evidence adduced on the trial, and from this alone. Hence we are of opinion that each case and each particular juror examined must be governed by the peculiarities surrounding that case and that juror, and that it is utterly impracticable to lay

down rules applicable to every case that may arise. Each case must be governed by its own surroundings. Still, we think it may safely be said that the judge should either himself conduct the examination, or at least so far conduct it as to confine it to the point under investigation, and not permit it to take so wide a range as to entrap the unwary juror into letting fall some expression not seriously and understandingly made, and from which it may afterwards be argued that he was not an impartial juror in the case. The juror should be treated with the utmost fairness in the examination, and not be subjected to the rigid cross-questioning sometimes indulged in in cross-examining a witness who is testifying in a case. The attitude of the juror and that of a witness are entirely dissimilar, and should be treated entirely different. Whilst it may become necessary to deal with seeming harshness with a refractory witness, it can never be necessary to so deal with a juror who is called upon to decide impartially between the State and the defendant in matters involving the liberty, it may be the life, of a citizen, unless, indeed, he should manifest an unwillingness to disclose what his real feelings or opinions are ; and this the judge should guard with great particularity. One who is too refractory or silly to answer a respectful question in a respectful manner is generally unfit for the performance of this important part in the administration of the law.

Recurring again to the thirteenth clause of art. 636, quoted above, the following language will be noticed : "That, from hearsay or otherwise, *there is established* in the mind of the juror *such a conclusion* as to the guilt or innocence of the defendant as will *influence him in his action* in finding a verdict. For the purpose of ascertaining whether this cause of challenge exists, the juror shall be first asked *whether*, *in his opinion*, the conclusion so established will influence his verdict. *If he answer in the affirmative he shall be discharged.*" We have italicized the words to which we invite particular attention. To our minds, the statute relating to

this examination is necessarily divided into two distinct parts — that portion just cited involving the opinion of the juror himself, and the portion which follows being permitted for the purpose of satisfying the court as to the strength of his conclusion. The remaining portion of the clause is as follows : "If he ánswer in the negative, he shall be further examined by the court, or under its direction, as to how his conclusion was formed and the extent to which it will affect his action, and if the court is not satisfied that he is impartial, the juror shall be discharged."

It will be observed that, agreeably to the plain language of the Code, when a juror shall have stated that, from hearsay or otherwise, there is established in his mind such a conclusion as to the guilt or innocence of the defendant as will influence his action in finding a verdict, having been first asked whether, in his opinion, the conclusion so established from hearsay or otherwise will influence his verdict, and having answered this question in the affirmative — when the examination shall reach this point, and the juror has stated that the opinion so formed will influence his verdict, the examination of this juror has reached to the extent that the law permits, and the law declares that *he shall be discharged*. A further examination of the juror is only permitted after the juror shall have answered that in his opinion the conclusion is *not* so established that it will influence his verdict ; and even then the law says that, after this examination shall have been made, if the court is not satisfied that the juror is impartial, he shall be discharged. These provisions of the Code are the same now as when *Black* v. *The State*, 42 Texas, 377, was determined by our Supreme Court. In that case the court said : " By a recurrence to the above quoted provisions of the Code it will be seen that the object of the further examination is to ascertain, first, that the juror has formed in his mind a conclusion ; second, the source from which it is formed ; and third, the extent to which it will affect his action. When the question is first asked the juror,

he is made the judge of the extent to which the conclusion
that he has formed will influence his action.  But when he
is further examined, the court becomes the judge of the ex-
tent to which it will influence his action, and this must be
determined by the nature of his conclusions, as ascertained
from what the juror says in answer to the questions.  A
slight, merely general impression, derived from hearsay or
floating rumor, may be denominated a conclusion which
might not ordinarily be a disqualification.  For it is implied,
in the shape of the first question above quoted, that a juror
may have some sort of a conclusion, founded on hearsay or
otherwise, which would not disqualify him.  A general
opinion, formed without any particular examination into the
facts, and derived from a source in which the juror placed
no great reliance, might be denominated a conclusion, and
still might generally not disqualify the juror.  On the other
hand, a satisfactory conclusion, from hearing and carefully
considering the evidence, would certainly disqualify the
juror.''  It is conceded that in the opinion in Black's case
it is not said, in so many words, that when the juror is con-
vinced that the conclusion that he has formed will influence
his verdict he shall be discharged ; but it is said in the
opinion that, '' when the question is first asked the juror, he
is made the judge of the extent to which it will affect his
action.''  We think the conclusion is irresistible that, if it
had been pertinent to the question then under consideration,
the learned judge who delivered the opinion would have said,
in the language of the law, that, having been first asked
whether in his opinion the conclusion so established would
influence his verdict, and having answered in the affirmative,
the inquiry was at an end and the juror should have been
discharged.  It is quite evident that what is contained in the
latter portion of the above quotation refers to an examina-
tion of the juror after he had not disqualified himself, and
one to be made for the purpose of satisfying the court that
the juror is impartial.

From our experience and observation, we are led to the conclusion that much of the trouble in organizing juries in capital cases has arisen from a failure to observe the line of demarcation between where the matter as addressed to the juror to determine the question of impartiality ends, and where the right of the court to determine the question begins; and in the present case we are of the opinion, judging from the bills of exception, that this feature was not properly observed by the judge. It must be borne in mind, however, that the court is the judge, after proper examination, of the qualifications of a juror, and shall decide all challenges without delay and without argument. Code Cr. Proc., art. 461.

Our opinion is that, in the character of investigation mentioned in art. 636, clause 13, when it reaches the point where the juror must decide for himself whether or not the opinion he has formed will influence his verdict, and he has answered a proper question eliciting an unequivocal answer, and has answered the question in the affirmative, that the examination should cease and the juror be discharged. And if he answers in the negative, then, and only then, should he be further examined by the court, or under its direction, as to how his conclusion was formed and the extent to which it will affect his action, in order to satisfy the court, who then becomes the judge as to the extent the opinion found will influence his verdict; and even then the matter should be made clear to the mind of the court, and, if not satisfied that he is impartial, it would still be the duty of the judge to discharge the juror.

In the present case we feel well assured that several of the jurors who sat upon the trial would, if permitted, have in their own opinions considered that their verdict would likely have been influenced, to some extent at least, by their previously formed opinions, occupying their minds at the time they were taken on the jury.

With regard to the ruling of the court to the effect that

the juror could not be compelled to disclose in his examination whether in his opinion the defendant was guilty, or whether in his opinion he was innocent, we are of opinion there was no error. It was the business and duty of the court to see that each juror stood impartial between the State and the defendant, and in the discharge of this duty the court has the power to stand a juror aside, whether challenged or not. See cases cited in *Nolen* v. *The State, ante*, p. 419. For an exhaustive discussion of the questions here involved, we refer to 1 Bishop's Criminal Procedure, and particularly to sect. 909, and to note 8 appended thereto, where are cited rulings in most of the States, including our own, and among them Black's case, herein referred to. And see *Rothschild* v. *The State*, 7 Texas Ct. App. 519. We appreciate the difficulties which surrounded the judge in the present case, in what appears to have been a careful effort to secure an impartial jury for the trial. If, however, such a jury cannot be had in the county, after proper effort has failed, then the law prescribes the remedy.

It is urged on behalf of the appellant that the court erred in not submitting to the jury a charge on manslaughter, but we are constrained to say that from the evidence as set out in the statement of facts there was nothing to require a charge of manslaughter. We desire to say, however, that the court might well have permitted the jury to consider the provocation mentioned in the proof, in determining the sedateness of the defendant's mind, with reference to murder in the first degree. With this isolated exception the charge is eminently fair and impartial, and an admirable enunciation of the law applicable to every issue raised on the trial.

Two bills of exception were taken to rulings of the court on the evidence. In one it is shown that the State's witness Pol was detailing a conversation between the witness and the deceased, in which it was proposed to introduce certain statements made by the deceased, when the defendant's counsel objected that the statements were not *res gestœ*, nor

had any predicate been laid for their admission as dying declarations. The court overruled the objection, and in this ruling we are of opinion there was no error. It is true that under the circumstances these statements were not admissible as dying declarations; but it is shown that they were made only about twenty minutes after the firing of the shot which inflicted the wound, and they were so intimately connected with the wounding as to negative the idea of manufacturing testimony, and were admissible as tending to explain the transaction. *Boothe* v. *The State*, 4 Texas Ct. App. 202; *Foster* v. *The State*, 8 Texas Ct. App. 248, and authorities there cited.

As to the matter set forth in the other bill, — the testimony being to the effect that, when the witness arrived at the house of the deceased, and the place where the deceased was, the witness found none of the family near him; or, as stated in the bill of exceptions, " none of the family went about him whilst she [the witness] was there,"— we fail to discover that it tended to prove any fact against the defendant, or to see its materiality in the case, unless to show the bias of other witnesses; neither do we perceive that it had, or was likely to have had, any appreciable weight with the jury one way or the other, and hence its admission would afford no ground for reversing the judgment. But, for the irregular and, we think, improper manner of forming the jury, and which was likely to have resulted to the defendant's prejudice, the judgment must be reversed and the cause remanded.

*Reversed and remanded.*